And I understand we're taking the cases in reverse order, so the first case will be Terinski v. Local104, Koscielny v. 104 Ms. Pollack Correct, Your Honor. May it please the Court, my name again is Cynthia Pollack and I represent Bob Terinski and Tom Koscielny. I reserve four minutes for rebuttal. And Your Honor, I would like to seek permission, I have an exhibit here today, it's part of the record, I wanted to be able to show it during my presentation if need be. Did your adversaries have a copy of this exhibit? It's in the reproduced record. Oh, it's part of the record? Correct. You want to show it did you say? Yes, just for clarification, instead of flipping through the big books, I'd rather just show you the letter. Why don't you just tell us where it is? Okay, I can do that to you, Your Honor. That's fine. We are here today because Bob Terinski, who was a firefighter for 29 years, and Tom Koscielny, who was a firefighter for 27 years, were forced out of the city fire department of the city of Wilkes-Barre when a new mayor became elected and took over. Can I ask you a question right off the bat about the collective bargaining agreement, Ms. Pollack? It appears that the one we've got in the record dates back to January 97 to December 31, 2000, and of course these events post-date that. Why isn't there a collective bargaining agreement that is, or is this somehow the one that was still in effect at the time of these events? And everybody agreed to that? There was no contention to the contrary in these proceedings, is that right? Well, all we have is that agreement, so I can't tell you if the city had anything, but there was not a lot of discovery on the collective bargaining agreement because they did not... Here's my question, though. You don't have any contention from the other side that this isn't the controlling agreement? Correct. Okay. And the district court took it as a given that even though this was dated the way it's dated, this is a controlling agreement, is that right? Correct. Okay. Well, why having the collective bargaining agreement, why didn't the plaintiffs pursue their rights under the collective bargaining agreement? They did, Your Honor. They filed six grievances and the union, Local 104, refused to process them, and that was one of our contentions that the court, that we should have our day in court, and these firefighters who risk their life every day, they go into a burning building, they be allowed a trial on the failure of the union to represent and stand up for these fine gentlemen. Well, sure, these are property loss that they assert in their claims. Their claims are that they were demoted and then also forced out. But they had not been demoted when they filed the grievance. Yes, Your Honor, they had been given a verbal by the chief who is a binding person on the city that they were demoted. They got a verbal demotion. As I however understand the record, they had not actually been demoted to the rank of private from assistant fire chief. They had been told that they were on a short list, but I understand as well that somebody told them that you have been doing good work and you may keep your position. So they, I understand conflicting information was given to them. But the point of the matter is that there had been no demotion at the time that the claims were made. I mean, am I incorrect about that? I believe, Your Honor, only because of the fact that the chief had given them a verbal demotion. Hadn't the chief, hadn't Chief Lisbon actually said in response to their grievance, as of today, date, time, they are in their positions. They have not been demoted. I mean, there may or may not be conflicting evidence in the record about what he said, but in an oral conversation. But when presented with a formal grievance, he said, you're in your positions. You're not demoted. You've got them now. And that is an official response to an official grievance. Why, if that's, and I think that's undisputed, that that's in the record. If that's the case, how is it that in response to Judge Fuentes' question, you can say they've been demoted? Your Honor, I believe Chief Lisbon was telling them this and then on paper saying that. And that is an issue of fact for a jury to decide because my clients were told that they were demoted. That you could go down to engine number five and get on as a driver, a hoseman. That is... Would your clients be prepared to then say, okay, I'll take my pension at the private level instead of the assistant chief? I mean, when they retired, they retired as assistant chiefs, didn't they? They did, Your Honor. Well, if they retired as assistant chiefs and that's acknowledged, how can you come before us and say, well, they were actually demoted? Well, they were acting in a capacity. The minute, and this is the reason why I wanted to show you this exhibit. Mayor Layton issued this letter that stated on November 26, 2003, that your job is open and you can apply for it. Wait, is that part of the record? Yes, it is. I think we've all read that. On 409, Your Honor. That letter, your job will be open, you're welcome to apply for the position, et cetera? Yes, Your Honor. And this could not be done because of the fact that a collective bargaining agreement existed, which protected their jobs and they could not be demoted without just cause. And that is why this letter instantly is misinforming these gentlemen that they lost their jobs because they're open. Let me press that point for one moment. Weren't they, the assistant fire chiefs, hired outside of civil service? No. Doesn't civil service require that there be a written examination and that they be then selected on the basis of some competitive procedure? Right, no. Because of the fact that you can be promoted, and I just had a case with the state civil service commission, and interviews without taking an actual test qualifies for civil service promotions. Were they ever at any time told that you are under the civil service rules of the state of Pennsylvania? Absolutely. In writing? The first day they were hired back in the 70s, Your Honor, so a lot of things weren't documented like they are today. But they were definitely tested at that time and did have civil service status. But the civil service statute in Pennsylvania was in full force, in effect, when they were hired? I believe it was, Your Honor. Because of the fact that they are civil servants, they had to take a competitive test when they first got hired. They definitely took a test in that regards, and they never lost their civil service status. And the union argues that, goes along with our argument, that they were civil service status. Does your whole case rest on that proposition, though? I mean, let's say for a moment that they're not under the civil service rules, that the mayor has discretion to fire individuals such as your clients. And this is one of my arguments. You don't even have to look at the collective bargaining. You could simply look at the political patron cases, which specifically say that we don't care necessarily about whether there's a property, right? People, all workers are going to be protected if they're a government entity and it's not a policymaking decision. Don't we have to look at the collective bargaining agreement? That's a remarkable position to take, that we can look at political patronage cases and not be concerned about the collective bargaining agreement. Because we've got a collective bargaining agreement in force. Let me ask you something more about that, in fact. You said, hey, they filed these grievances and the union didn't pursue them. When I read Article 16, I note that it's got multiple steps, and among those steps are the opportunity to take the grievance to the mayor if they were unsatisfied with the way it was resolved by the chief, and then if they're unsatisfied with the way the mayor's handled it, to take the matter to arbitration. And indeed, the language is mandatory. The matter shall be submitted to arbitration. So it looks like there's no discretion on the part of the union or the mayor to say we're not arbitrating it. These people had the right to make it happen. Why didn't they do what the collective bargaining agreement gave them the right to do? My firefighters cannot do what the union's job is. The union is the exclusive person who represents them, and that is the only person who could bring the grievance anywhere. The only person who could bring it is Step 1. The only person who could bring it is Step 2. The only person or entity that could bring it to Step 3. Is there any evidence at all that they asked the union to take it to the mayor? That they asked the mayor for a resolution or that they asked for arbitration? Your Honor, they asked for full grievance. Where is that in the record? Where is it in the record that they pursued the full panoply of rights granted to them under the collective bargaining agreement? Because I haven't seen it. Those six grievances are their request for the union. We need help. And the union said, we don't care. We don't even talk to, the union never talked to them. I hear you saying that they filed six grievances and the union didn't help them. But that tells me that they stopped at Step 1. This is a multi-step process. Why didn't they do the things that the agreement gave them the right to do? And while you're thinking about that, neither side cited the Dykes v. Septic case in the briefing, but the district court judge did cite it. I mean, I didn't see it in the list of cases that people had cited, so maybe it's in the brief someplace. But looking at the district court decision, Judge Puto relied on that, pointed to that case. And that case I think says, you can as an individual make the union, you can go to court and make stuff happen that you're entitled to have happen. So I'm asking two questions there. One, a record question. Where is it in the record that they actually went past Step 1? And two, how do you answer the Dykes case which says, as a union person, you can make stuff happen even if the union's not doing what it ought for you? And I'll respond in two-fold. Number one, I think that filing agreements is all you need to do. Your union should be taking it. Your union has a duty to investigate. It's the union's responsibility. The Dykes case, the proposition is that you can go and file in another court a mandamus to compel them to act. What is the union's purpose for? But if there is a claim for breach of duty of representation, the union has a duty to do so. And number two, on your second about the collective bargaining agreement, you can decide in these firefighters' favor. You have the power today to decide in favor of them. Just on the political patron case alone, which you do not need a property interest in order to be allowed to go to a jury on that case, on a political discrimination, demotion, or termination. You in fact had made some claims that were responded to first, I believe, by the union representative. Secondly, by the chief, I believe it was Chief Lehman. And then you got a letter from the mayor. Isn't that correct so far? I'm sorry. I didn't follow you. You did get responses to the claims that the firemen made. And in each case, the response was, you haven't lost your job. You haven't been demoted. You have no claim that can be made at this time. And only one response, which was a letter from Chief Lehman. And all he says is that you're still assistant fire chiefs. They were acting. The mayor admitted that they were acting in a capacity. If your job is open, how could you still have it when the mayor says, we're interviewing for it right before your eyes. And you don't have it. You need to submit a resume. To me, that is not saying, oh, I have my job anymore. I have to interview for it. And then the Chief Lehman is telling me that I'm demoted. I could go down and drive up. There's no question they're in a difficult position. But the point of the matter is that didn't they have choice? In other words, they can remain in their position or they can opt for retirement. And I disagree. I don't think that. I don't think they had a choice because of the fact that they, number one, was told that they were going to lose a lot of money, which was a lie because under the collective bargaining agreement, they weren't going to lose anything because they had to, the city had to keep them in that position. Is it your view that they were forced or coerced to retire? They were forced absolutely to retire. Why would people? How were they forced to retire? Because the Chief Lehman misled them, saying that you're going to lose money. It's going to look bad in the paper. Magar said you're going to lose money if you don't retire. That's forced to me. If they didn't retire and the city did as it promised, they would be substantially less on their pension because it goes on your last few years of earnings. So they had no choice. And a person in their choice, or at least I should get the opportunity to go to a jury with this evidence I have, I had Jay Delaney state that they were forced out. I had enough to get to a trial. That's all I'm asking for. If, as you say, they are subject to civil service rules and cannot be fired except for a just cause, and if, as you say, no just cause was given to them, isn't the best option to go ahead and play it out and if they get demoted, then they file an agreement with the union? No, Your Honor. The union already told them, we're not helping you. Where did they say we're not going to help you? You say they weren't helping. Do you have record evidence where somebody from the union said, we're just not helping you? We're not going to do what you want. Well, turning in a grievance and not even the person, anyone from the union coming to you and saying, you need to file this grievance. So it's an inference. It's not that the union said we're not going to help you. Correct. You've got an inference. Absolutely. Can I answer? Sure. Now you said they were misled. The district court, it seems like in front of the district court, that that wasn't an argument that was made, but you can help me out on that. I read both of the opinions pretty closely and I saw on page 10 of the Terinsky one and page 9 of the, how do you say Mr. Kosielek's name? Kosielek. Kosielek, okay. Mr. Kosielek, the opinion referring to him, that coercion had been argued but not deception. Was Judge Caputo mistaken? Well, I think that Judge Caputo made a decision about this case and dismissing this case that wasn't even argued by the defense, which was that he was looking at involuntary in a sense of either you do it through coercion or being misrepresented. Those are the only two ways to get an involuntary retirement because of the presumption with your court. So to me, I wasn't even given an opportunity. These gentlemen weren't given an opportunity to present evidence that of course they were misled. Why would they run away from a job? My question is not whether they were or weren't. I mean, I understand you folks have a position on that. My question is, did you make that argument to the district court? The defendants did not present that. I said that it was certainly involuntary, but I did not go through to, I said it was a forced term retirement. I didn't have to go through the steps because opposing counsel didn't present that argument for the court to rule on. The court did that. It's your argument, right, to make about how it was forced or how it was a coerced resignation. And I think I have, I believe I've got the answer to my question. Thank you. Thank you. Ms. Polley, thank you very much. Mr. Dean. Thank you, Your Honor. May it please the court. My name is Jack Dean. I'm here on behalf of appellants, the city of Wilkes-Barre, Jacob Blissman, and Mayor Tom Layton. I'm here with my co-counsel, Debbie Simon. With the court's indulgence, I also brought with me a second-year law student, Frank Craigle, who is a second-year law student at the University of Richmond. And he's doing a fine job and we hope Frank stays on with us and he's here to hear this argument. A couple of housekeeping matters in response to some questions posed. Your Honor, Judge Jordan, the CBA that's in the record is the CBA that was in effect. It was expired at the time of the incidents in question, yet as you, Your Honors know, the CBA remains in effect until a successor agreement is negotiated. Subsequent to the events at issue, a subsequent agreement was negotiated. So this is the right CBA. Could you clarify, because to me it's a threshold question, but could you clarify the fireman status with respect to civil service? Yes, I can, Your Honor. Are they subject to civil service and can only be discharged for a good cause or are they outside of civil service, subject to, I guess, the mayor's decision? They are outside of civil service. It's undisputed, and this was my next point. 511A, 518A, 550A, and 556A of the record, appellant's testimony, not Mayor Layton's testimony, they were appointed to these mayoral positions. When they were initially hired back in the 70s, they took civil service exams as privates. They were covered under civil service tests as privates, which is why they, according to them, they would have been demoted back to privates. But once they accepted those mayoral appointments, which were subject to every four years, and that's in the record. Doesn't their civil service protection continue after their, once they're in civil service, and even though they get a mayoral appointment, doesn't civil service give them protection? It gives them protection if they were civil service employees, they could get demoted back to their last rank that they held under civil service, which was privates in this case. Actually, based on what you're saying, if they had been demoted back to private, they could have filed agreements as private under civil service. Under CBA, Your Honor. Under the CBA. Under CBA. They could have filed agreements under CBA. They would have had civil service protection. Well, they would have had CBA protection. Under Article 27, it provides for demotion with just cause under CBA. That provides you have to be subject and obtain your position by civil service exam. They did not. It's undisputed. They interviewed and were appointed by the mayor in 2000 and 2002, respectively. All right, so your point at any event is the mayor has discretion to hire and fire for those specific positions. And they have, and they've done it for the last 20 years or more, and it's in the record under the union testimony, under Chief Delaney's testimony, under their testimony that they were appointed. Well, you know, I'm somewhat sympathetic because they really are caught between a rock and a hard place. I mean, the choice is almost no choice at all. I mean, can you comment on the fact that they really, for all intents and purposes, were going to be sent back or demoted to the private position? And you might, while you're at that, comment on whether there's a dispute of fact on that point, which Ms. Pollack emphasizes. February 10th, undisputed. Chief Listman tells them, February 10, 2004, you didn't make the short list of the transition team. That's undisputed. Chief Listman told them that. I mean, what does a fireman think at that point? If I get demoted right now, I mean, you can wake up in the morning and all of a sudden you're a private. Guess what? I've lost the opportunity to retire as an assistant fire chief. I've lost several thousand dollars, whatever the amount of money is. So I am in a very difficult position. I can either just ride it out and get demoted and then maybe not be able to retire as a captain or go ahead and retire. It's really almost no choice at all. Well, under Judge Caputo's reasoning and not even taking the cases Judge Caputo cites, the Hargrave, the Christie case, the Filborne case, all those cases, they specifically say that a choice between retirement or demotion is a choice. It may not be a nice choice that you want to make, but it is a choice. And in this case, on February 10, when Chief Listman said you didn't make the short list, keeping in mind Mayor Layton testified that no decision was made, the record establishes that no decision was made until July, four months later. Well, your opponent makes the argument, which I'd like to hear the response to, that there's factual issues here that ought to have been addressed by a jury, whether they were getting conflicting messages and whether, I guess, a reasonable person in their position would think, well, maybe I really am demoted, maybe I'm not, I don't know what's going on here. And more than that, it's clear and it's undisputed that they've told me I am going to be demoted, I didn't make the cut, I'm going to lose my job, and if I don't retire now, they've said I'll be publicly humiliated if we accept their version of the facts. That's correct. And we'll lose a lot of money. So if we were to accept their version of the facts, would that create a circumstance where you'd say even if the shoe hasn't dropped, you're effectively forced out? Under the cases that Judge Caputo cites that I just referenced, Harden and Christie, no, 511A, 518A, 558, 556A, they worked as, were paid as, and retired as assistant fire chiefs. They did not file a, they claim that a November 6, November 03 letter demoted them. They didn't file a grievance over that. Is it fair inference from the record that the mayor wanted them out? No. That the mayor said, and that the chief wanted them out, and that that's why there were these alleged conversations about better retire now, save face, save money, better do it now. Does that, if you give the record the best spin for their side? Well, the record, the best spin for their side, all you have to do is take a look at their own testimony. After this alleged conversation with Chief Listman on February 10th, Mayor, Mr. Terinsky specifically, asked to meet with the mayor. The mayor said, come on in, and this is his testimony, not the mayor's. Page 521A and 520 of the record, he didn't go and see the mayor. The mayor offered him an opportunity to come see him. Well, I don't think you really are giving their side the best spin. There's evidence in the record where they say, Chief Listman came to me, said, you better retire, you're going to lose face, you're going to lose money, and other people spoke to them in a way that gave them to understand this was done, and they were being shown the door. Now, if we read the record that way, that there was an intent on the part of the new administration to force them out, and that in the end, that in fact is what happened, how is it consistent with the case law we've got about coerced retirement to say, if you intend to force somebody out and you succeed in forcing somebody out, that that's not a forced retirement, that's not a coerced retirement? Your Honor, I don't even know. Under those cases that Judge Caputo cited, and I read them again last night, those are demote or resign, file criminal charges or resign. Those were not coerced retirements in those cases. And also, you don't even need to get to whether it was voluntary or not, because there's no dispute that this is a constructive discharge case, and in a constructive discharge case, they had all the due process that they were entitled to because they were under the follower in virulent-minded cases. There's no louder, no hearing required in constructive discharge cases. And in the Dykes case, which is cited on page 174 of the record by us below to Judge Caputo, we did cite the Dykes case. But not in this court, right? Not in this court, but it is in the record, Your Honor, on 174A. Post-deprivation process under Leheny, Dykes, Jackson satisfies due process, so you don't even need to get to whether they were forced out or not. All you have to do is look at what process was there and what did they obtain. In Dykes, as the court properly pointed out, they had the opportunity to petition the court. In fact, they admitted on page 520A that they never asked the court to intervene, they let the grievances die, and on page 564A, they didn't take them any further to the union. They admit that. That's not from anything from our side. That's their side. Did you guys ever contend in the district court that the assistant fire chief spot was not a protected property interest? Did the question of whether it's a protected property interest get litigated before Judge Caputo? We made that argument in our reply brief in support of summary judgment, Your Honor, on page 14 or 15, if I recall correctly. But we did make that argument to Judge Caputo in our reply brief. A couple more questions. Jay Delaney, Appellant's counsel, mentioned a thing about Jay Delaney. 298A of the record, Captain Jay Delaney testified that at the time he left, these individuals in January were still assistant fire chiefs, and he specifically said he doesn't know what happened afterwards because he was no longer there. That's on 298A of the record. A couple of things also. There was an argument that we did not brief. I'm sorry, I'm finished. You want to finish your thought meeting? Ms. Pollack took a couple extra minutes. Or are you done? No, I would like to finish this thought because there was a statement in the reply brief, which obviously I didn't get a chance to address until now. On page 16 of the reply brief, there was an argument that we did not brief or move on the First Amendment claims. Page 173 to 176A of the reproduced record, not only did we move, we briefed it. And interestingly enough, in her primary brief, also happened on page 16. She admits that we did move. And also, finally, last thought is on page 5 of their brief, they referenced Mayor Layton, and they admit that Mayor Layton took everything out of the process because he distanced himself from this transition team who did the interviews. That's in their brief. They acknowledge that was a fact. Thank you, Your Honor. I have a question. Yes. If they had retired on February the 28th, as they did, if they had been demoted on February the 27th and had chosen to retire on February the 28th, would they have suffered any loss of pension? Their pension, Your Honor, is calculated based on, if I'm not mistaken, their last year's salary. So whatever that last day, it would have been a minute reduction because it's based on your last year's salary. So if you have 364 days, and let's just use numbers of 50,000, and the difference in salary, which is in the record, is $5,000 between a private and an assistant chief, they would have one day at $45,000. So whatever that average salary was is how the pension is calculated. They did file agreements over the pension calculations and were successful, and that is also in the record. Thank you, Mr. Dean. Thank you very much. Mr. Holroyd. May it please the Court, my name is Stephen Holroyd, and I'm here on behalf of Firefighters Local 104. I apologize for the condition of my voice. I'm getting over a cold, and it's pretty much shot. I don't know what I can add that Mr. Dean hasn't covered, so I'd like to touch on a few things that I think were raised by the Court with some of its questioning. I think a key thing to remember here in determining whether this choice was voluntary, the choice to retire was voluntary, was that these employees did have a choice. Unlike the large majority of employees in the Commonwealth, they were more than merely at-will employees because they were covered by a collective bargaining agreement. Well, is there a dispute of fact about how they were being covered by that agreement? In other words, you heard Ms. Falk, and surely you've heard it in the Court below, say that their union representative wanted their job. He wasn't going to help them because he wanted them out. In fact, he got the job, and that, therefore, the union was not only not representing their interests, but their union rep was actively working against their interests. If there's a fair factual question of that, does that raise a material issue that should have been given to a jury? If that raised a factual question, then you could argue that it should have been put before a jury, but there's not a scintilla of evidence in the record. There's not one bit of undisputed fact in the record below that supports that contention. It doesn't the mere fact that the fellow who was their union rep applied for and got their job raise an inference of conflict? I don't think so, Your Honor. One of the positions was declared open, and a number of individuals who weren't already assistant chiefs applied for the position, including the union president.  There's nothing in the processing of these grievances that would indicate that the union gave the grievances short shrift or otherwise failed to take them seriously. What the evidence shows is... Your opponents say the evidence is that they laid down, that they got one response from Chief Listman, and they said, Okay, guess you're not demoted, guys. Good enough. And factually, that is, in fact, the case. What happened was the plaintiffs filed separate grievances saying, We want to know why we've been demoted. And the response to that grievance was, You have not been demoted. It was a response to the union president. The two plaintiffs were cc'd on that response. Factually, it was correct. As the evidence shows in the record, they were performing a grievance of assistant chief. They were being paid as assistant chief. There was nothing indicating that they had been demoted. And neither one of those two individuals then went to the union and said, Hey, we got this response, but we still want to pursue it because I don't care what he says in that letter. What he told us in the firehouse was something different. They never asked the union to take it one step further. And that first-year law school analogy, when you're talking about factual impossibilities, you cannot pick an empty pocket. You can't grieve a demotion that hasn't taken place yet. If they had, in fact, been demoted, then they could have filed a grievance. In fact, Mr. Mencar made it quite clear. If they had been demoted, we would have taken that case to arbitration because it was the union's position that they could not be demoted. But the demotion never took place. So they don't reach the issue. So the position of the union is if the union rep applies for the job, wants the job, gets the job, and does nothing in response to a letter that says as of this minute, because it actually gives the time, as of 9 o'clock today, you're still in your job, that the union rep has no obligation or opportunity, shouldn't be doing anything more to represent the interests of these firefighters. I mean, I take that to be their argument, that you can make an inference from the fact that he did nothing more that shows there was a conflict and that they didn't do it. In response to that, Your Honor, I suggest, with all due respect, that that argument has taken some facts of placing the cart before the horse. Did Mr. McCart get one of the assistant chief's jobs? Yes, he did. Five months after the resignations, after retirement. It's important to note that no other assistant chief was replaced. The only two new assistant chiefs came about as a result of the two vacancies created by the voluntary retirements of these two individuals. Because after the fact, the union president was able to avail himself of a vacancy that was created purely by the voluntary action of the retirements. And that, in fact, creates a conflict. Had he expressed interest in the job when it was, quote, open? He did, and he expressed interest in the job prior when there were vacancies created by retirements. That was not in the speed of notice. The firemen were left with two choices, neither of which they wanted to exercise, and one is leave the fire department, and the other one is stay and you're going to get demoted as a private. Could you not pursue, I mean, take the side of the firemen and present this to arbitration? They could have had agreements over their demotion being filed, but you'll note none of their agreements had said, I want to grieve my demotion. The grievances said I was not presented with written reasons for my demotion. I want to know the reasons for my demotion. Not challenging the motion itself. What if they had said, I want to grieve over my prospective demotion? I've been told I'm going to be demoted. I don't recall if that was agreements. I do recall. Well, I'm saying, what if they had presented it to you that way? Not that they were asking for reasons or written reasons. Fair enough, Your Honor. If they had said, we've been demoted, we wouldn't grieve that. The response is, you haven't been demoted. There's nothing to challenge. It's like saying, they fired me. And the city comes back and says, no one's been fired. As you can see, he's still working. There's nothing to take to arbitration. They had a choice, as I think the court has noted in a couple of cases. They had a choice. They could have stayed and fought under a collective bargaining agreement that did contain the just cause provision, even putting aside the civil service argument. There is just cause, and that's something an arbitrator would have been able to consider. There are no guarantees, mind you, which is why I think playing this argument that all misrepresentations were made doesn't carry much weight, because with just cause there are no guarantees. It's a question of interpretation for an arbitrator. But they had a choice. They opted to retire. And I think as the district court probably found, it's the end of the inquiry. All right, Mr. Hallory, thank you very much. Thank you, Your Honor. Ms. Pollack? Thank you, Your Honor. I just want to note that, again, under the political discharge, you don't have to look at the collective bargaining agreement. And the Rutan case specifically says that you don't have to look at the interests, whether there's a property interest. The civil service, I know that there's a lot that's been raised. But how can we conclude that this was a political discharge when the mayor was not directly involved in the decisions to discharge? He had a transition team established that made the decisions. A jury can believe me. And when they see this letter that your position is open, the only reason why we're here before you is because of this letter. If this letter was never sent, it would never have placed their positions with the fire department in jeopardy. They would have held their positions. Like, for 20 years, no assistant fire chief has been let go. All the letter does is that it says all of the assistant fire chief positions are going to be open. You are welcome to reapply. And pursuant to the collective bargaining agreement, they couldn't do this. They couldn't take away. So if you take us back into the collective bargaining agreements, Paula, don't you put yourself right back into the issue of you could have grieved and you didn't. You did not. There was no, as Judge Fuentes pointed out, it was possible, theoretically, to say, I want to grieve a demotion. If they thought they were demoted when they got that open letter, jobs open, they could have grieved it and they didn't. And I only wish firefighters had me standing right behind them when that happened because I would have helped them. You can't expect, I think, people who are civil servants, workers, to know all the ins and outs like you had raised about why didn't they go to their union rep. To me, the onus is on the union to help them. I only wish they had grieved that. They didn't. When they got, they actually grieved, I am being demoted. I want a hearing. How come nobody responds to those parts of their grievance? All it is is at this moment you're acting and you're assistant chief. Well, I understand they didn't like that response, but that is a response, right? When you say, I want to know why I'm demoted, and they say, well, you're not. You've got that job. Well, Your Honor, that's a response from Chief Listman. Mekar, who ended up with their position not once, even sat down with either of two individuals and asked them anything about their grievance. Tell me why do you think you're being demoted? Why did he say to them while he's interviewing for their job, you know what, there is no opening, guys. Don't worry about it. Because he wanted their job. And I think I presented enough, we presented enough evidence just to get our day in court. We're not asking you to rule in our favor outright. Just give us an opportunity to present this to eight peers of my clients. Give them that day in court. But you did ask the district court for just what you said you're not asking for. I mean, there were cross motions for summary judgment here, right? Correct. So you thought there was a sufficient evidentiary record? I still do. I still do. But I know it's hard in your positions what you're in a sense of, I want to make it as easy for you to rule in my favor as I possibly can. And to me, give me a jury trial on the political patron line of cases. I don't need a property right. So you don't even have to worry about the civil service issue that has been raised but was actually waived because it wasn't presented to the district court. I'm trying to make it as easy. Your best argument is in a political patronage position is that they could not be fired because they were outside of civil service. They could not be fired without cause. My best argument is that they were fired because of the fact that they did not support the incoming mayor. But then that's a First Amendment issue that you want to raise, and you say there's a factual issue. And I did raise it, and the court refused to even look at that claim, and that's why my first, and they didn't ask for that dismissal. That's your best argument for getting this matter to a jury? I believe, Your Honor. That's my assessment of what I believe is the best argument for you. You said that was raised. It was raised at summary judgment? Absolutely. And I don't know why the court didn't address that issue and focus solely on whether the retirement was cast out. Did you have an argument before Judge Caputo? No. This is the first time my clients are even being in a courtroom. And I just want to ask this court, we presented enough facts that one can infer that my clients were forced out. They had no choice. How are they supposed to survive on a pension that's going to be less money? And people, that's how they survived. And them asking about their pension, that's a logical thing. That's important to guys, guys who've been fighting fires, running into buildings for, you know, 20, almost 30 years. I understand that. But, you know, it's difficult to adopt this First Amendment position because, in fact, they were working for the mayor, both firemen, weren't they? Are you saying this is a retaliation on the part of the administration for political reasons? It's a political forced demotion, political demotion. This letter shows you that they're taking him out of his job because the new mayor's coming in. Wasn't that letter directed at a number of positions? And some policymaking positions can be politically, people can be terminated. But not a firefighter. How does being affiliated with a political party make you a better firefighter? It doesn't. And so political patrons should not be involved at all. Okay, Ms. Pollack, I mean, we've got your arguments. Thank you very much. Can I ask the same question that I asked before? If they had been demoted on February the 27th and had retired on February the 28th, as they did, would they have suffered any loss of pension? And I would have to say, Your Honor, yes. But we are asserting that they were demoted when they received the verbal. They were only acting in an acting capacity ever since they received this letter. But, yes, one day their pay is going to go down. All right, thank you. Thank you. Thank you both. We'll take the case under advisement. Mr. Fernandez here? Yes. You made it? Okay. Call the next case, Hashmi v. Attorney General.